IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBERT GILBERT, )<br>)<br>    Plaintiff, )<br>)<br>) <br>) Case No. 08-cv-0614-MJR<br>vs. )<br>)<br>MARY LOFTIN, M. HYTHAM I. BECK )<br>and ADRIAN FEINERMAN, )<br>)<br>    Defendants. ) | |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

### I.  Factual and Procedural Background

Plaintiff Robert Gilbert seeks monetary damages against Defendants Mary Loftin, M. Hytham I. Beck and Adrian D. Feinerman, alleging that they denied him adequate medical care for his serious medical needs in violation of the Eighth Amendment while he was confined at Menard Correctional Center and Lawrence Correctional Center.[1] The matter is now before the Court on Dr. Beck's motion for summary judgment (Doc. 102), and the Court will confine its discussion to the claims brought against Dr. Beck.

Dr. Beck is a general surgeon who was recruited by Lawrence County Memorial Hospital ("the hospital") to relocate his private practice from Fairfield, Illinois, to Lawrenceville, Illinois.  *See* Doc. 131-3.  The hospital was in dire need of surgeons to serve the Lawrenceville

---

[1] For the rather convoluted history of this case, from its inception in the Northern District of Illinois on May 10, 2007, to the current proceeding on Count 2 of the first amended complaint, see Memorandum and Order, Doc. 88.

1

community, and it was believed that Dr. Beck's presence as one of the hospital's staff physicians would be beneficial for the hospital. *See* Doc. 131-3.

Dr. Beck agreed to relocate to Lawrenceville, and, in 2005, he and the hospital executed an "independent contractor agreement" ("IC agreement"). In exchange for Dr. Beck's moving his practice, the hospital agreed to pay his relocation expenses, grant him staff membership and clinical privileges, pay him a bi-weekly salary, and set up and manage his office by hiring personnel, providing billing services and paying vendors. (Doc. 131-3, pp. 3-4). While the IC agreement did not prohibit Dr. Beck from becoming a staff physician at any other hospital, it required him to work at least 40 hours per week and at least forty-six weeks per year. *Id.* Dr. Beck's private practice was also located at the hospital, where he was the only surgeon on staff from September 2005 until March 2009. *Id.*

The IC agreement required Dr. Beck to provide medical care to "members of the public" but did not specifically require him to treat inmates. *Id.* However, the hospital's medical staff bylaws - as explained by the hospital's chief executive officer, Doug Florkowski - required staff physicians to treat "any patients that presents themselves to our hospital which would include inmates." *See* Doc. 131-2, Florkowski Dep. 18:3-7. Moreover, the hospital entered into a contract with Health Professionals, Ltd. ("HPL"), a managed care organization which undertook "to provide for the health care needs of the inmates and detainees." (Doc. 131-8, pp. 3, 5). HPL agreed to pay the hospital for any medical treatment or services it provided to inmates for whom HPL was responsible. *Id.* HPL and the hospital signed this agreement in April 2005, but the terms of that agreement stated it "shall continue in full force and effect for the period of one year from June 1, 2004 through June 1, 2005, and shall automatically renew for one-year periods hereafter." (Doc. 131-8, p. 14).

As one of the hospital's staff physicians and as the only surgeon working at the hospital, Dr. Beck provided medical care to the general public and, at times, to inmates who were referred to him (Doc. 131-1, pp. 6, 8). On November 1, 2006, Mary Loftin, M.D., the medical director at Lawrence, asked Dr. Beck to provide a surgical consultation for Gilbert, who, at the time of Dr. Loftin's request, had been experiencing severe problems with his colon for almost two years and had undergone two surgeries for this condition while he was incarcerated in Cook County, Illinois (Doc. 131, p. 2; *see* Doc. 133-1, p. 8). Dr. Loftin sent Dr. Beck a written consultation request form and followed up with a fax:

> 38 year old male…Approval only for colonoscopy only - rule out fistulotomy. They [Dr. Loftin and her staff] will do H&P and labs. (Doc. 131-5, p.1).
>
> See referral for offender. We would like to do H&P here and blood work and just schedule for procedure if possible. (Doc. 131-9, p. 1).

Although Dr. Beck maintains that he was not obligated to do so, he agreed to treat Gilbert. *See* Doc. 131-7. On November 17, 2006, Dr. Beck examined Gilbert at the hospital. He performed a colonoscopy and diagnosed him with having "superficial rectal fistula, rectal fissure, and a spastic colon." (Doc. 131-7, pp. 1-2). Dr. Beck concluded that Gilbert did not need surgery (*i.e.*, the fistulotomy); however, he wrote Gilbert a prescription for "an irritable bowel syndrome cocktail." *Id.* Additionally, he recommended that Gilbert take a sitz bath and apply xylocaine after each bowel movement. *Id.* After this appointment, Dr. Beck did not see Gilbert again (Doc. 131-7, p. 2).

Unfortunately for Gilbert, he continued to experience severe symptoms after Dr. Beck performed his colonoscopy (Doc. 119, p. 5). Gilbert alleges that he filed nineteen grievances at Lawrence, seeking help for his medical condition. *Id.* After exhausting his administrative remedies, Gilbert filed suit under 42 U.S.C. §1983 in the United States District

Court for the Northern District of Illinois. Subsequently, the case was transferred to this District.

On May 18, 2009, Dr. Beck moved for summary judgment (Doc. 102), claiming that Gilbert's §1983 action against him fails because he was not acting under the color of state law when he treated Gilbert in November 2006.

## II. Analysis

"Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." ***Storie v. Randy's Auto Sales, LLC,* 589 F.3d 873, 876 (7th Cir. 2009).** "To survive summary judgment, a non-moving party must show through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof of trial." ***Knight v. Wiseman,* 590 F.3d 458, 463 (7th Cir. 2009).**

Plaintiffs who bring claims under 42 U.S.C. §1983 must show they were deprived of a "right secured by the Constitution or laws of the United States ... [and] ... the alleged deprivation was committed by a person acting under the color of state law." ***Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009)** (*citing Daniels v. Williams,* **474 U.S. 327, 330-31 (1986);** *Reynolds v. Jamison,* **488 F.3d 756, 764 (7th Cir. 2007)).** The "color of state law" requirement is "the equivalent of the state action requirement in the Fourteenth Amendment analysis." ***Rodriguez,* 577 F.3d at 823, n. 6.** "Like the state-action-requirement of the Fourteenth Amendment, the under-color-of-state law element of §1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." ***American Manufacturers Mutual Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999).**

In ***West v. Atkins,* 487 U.S. 42, 54 (1988)**, the Supreme Court held that a private physician who has entered into a contract with a state to provide medical care to inmates acts under the color of state law because "such conduct is fairly attributable to the state." ***West,* 487**

**U.S. at 54.**  The employment relationship between the state and physician, however, was not the determinative factor in *West*.  The Court explained:

> It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can be fairly attributed to the state.  Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner.  Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.

*Id.* at 56.  Thus, the critical factor in this analysis is determining what role the physician played.  *See id.* **(noting "it is the physician's function while working for the state, not the amount of time he spends in the performance of his duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of state law.").**

In *Rodriguez,* the Court analyzed the *West* decision and set forth four factors for district courts to consider when a private physician, who is not employed by the state, provides medical treatment to a state inmate.  *Id.* **at 826.**  Noting that the Supreme Court used the "public function test"[2] in rendering its decision, the *Rodriguez* court reasoned that courts should take into account the "theoretical underpinnings" of the public function test when "apply[ing] *West* to other medical care situations involving incarcerated persons":

> The theory is that if the government must satisfy certain constitutional obligations when carrying out its functions, it cannot avoid those obligations and deprive individuals of their constitutionally protected rights by delegating governmental functions to the private sector.  The delegation of the function should be accompanied with a delegation of constitutional responsibilities.

---

[2] The public function test requires district courts to decide if "state action is present in the exercise by a private entity of powers traditionally exclusively reserved to the State." ***Jackson v. Metropolitan Edison,* Co., 419 U.S. 345, 352, 95 S.Ct. 449, 455 (1974).**

*Id.* at 826 (citations omitted). *See also Mitchell v. St. Elizabeth Hospital,* 2004 WL 2829014, *2-3 (7th Cir. 2004) ("The theory behind the Supreme Court's recognition of state action in *West* was that the state had delegated a function for which it could not disclaim responsibility. The basis of the Court's holding was not the physician had provided services, but rather that the state had 'an affirmative obligation to provide adequate medical care' to the [inmate]."). As a result, as noted above, the functional analysis must "focus on the relationship among the state, the health care provider *and* the prisoner." *Id.* at 825 (emphasis in original).

*Rodriguez* mandates that district courts consider the following factors when deciding whether a physician who has provided medical care to an inmate acted under color of state law: 1) the setting in which the medical service was rendered, 2) the degree of state control or coercion, (3) the contractual relationship between the state and the medical care provider, and 4) the relationship of the medical provider to the prisoner. *Id.* at 826-28.[3] The Court will analyze each factor in turn.

### *Setting in which the medical service was rendered*

When a physician treats an inmate in a "correctional setting" he is "affected by that setting in the performance of his medical functions." *Id.* at 826. Consequently, a court's decision to treat a physician as a state actor is often influenced by where he treated the inmate. *See, e.g. Anglin v. City of Aspen, Colo.,* 552 F.Supp.2d 1229, 1243-44 (D. Colo. 2008) (state action found when medical treatment was administered in an institutional setting); *see also Neal v. Anspaugh-Kisner,* 2008 WL 506336, * 10 (E.D. Mich. 2008) (doctor who treated

---

[3] The Seventh Circuit explained that "[t]hese considerations do not provide ... a pat answer as to whether any particular medical care arrangement constitutes state action through the application of the public function doctrine. They are, however, the factors that *West* indicates we must apply in our assessment of the individual case." *Rodriguez,* 577 F.3d at 828.

**inmate at private orthopedic clinic was not a state actor because "he did not see the plaintiff in the prison."); *Martinson v. Bruce,* 1991 WL 241857, \*2 (D. Kan. 1991) (doctor treating patient at clinic that was not located on prison grounds was not a state actor under §1983).**

As noted above, Gilbert's colonoscopy took place at the hospital where Dr. Beck has his private practice.[4] This fact cuts against Gilbert's argument that state action exists here. However, the *Rodriguez* court additionally noted that not "all medical advice rendered outside of the prison walls is exempt from the state action doctrine simply because it is provided outside the prison.... The state clearly does not relieve itself of its responsibility to provide medical care solely on account of the venue where those services are rendered." *Id.* at 826-27; *see Conner v. Donnelly,* **42 F.3d 220, 225-26 (4th Cir. 1994) (court concluded that physician was a state actor even though he treated plaintiff in his privately-owned clinic).** For these reasons, the first factor of the test is not dispositive of whether Beck was a state actor under § 1983 when he treated Gilbert, and, as such, a genuine issue of material fact remains.

### *The degree of state control or coercion*

The second factor in the Court's analysis is the degree of state control over Dr. Beck's actions. *See Rodgriguez,* **577 F.3d at 827 ("[T]he degree of state control or coercion is a very significant factor in determining whether the private individual's actions can be 'fairly attributable to the state.'") (citation omitted).** "A state normally can be held responsible for a private decision only when it has exercised coercive power or has provided

---

[4] It is not clear to the Court whether Lawrence County Hospital, where Dr. Beck treated Gilbert, is a county-owned hospital, a fact that if known, could affect the Court's analysis. "[A] county-owned public hospital, like a public school or a municipal park, is a state actor...." *Lewellen v. Schnek Med. Center,* **2007 WL 2363384, \*6, n.10 (S.D. Ind. 2007) (collecting cases). And see Lewis v. Downey,** 581 F.3d 467, 471, n.3 (7th **Cir. 2009) (describing county employees as state actors)**.

such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State.  Mere approval or an acquiescence in the [actions] of a private party is not sufficient to justify holding the State responsible." ***Blum v. Yaretsy,* 457 U.S. 991, 1004-05 (1982).**  This determination requires an assessment of "the degree to which the professional decisions made in rendering the care are influenced by the status of the patient as a prisoner and the directives of the state, as the ultimate responsible party for the prisoner's health care, with respect to the manner and the mode of care." ***Rodriguez,* 577 F.3d at 827.**

As noted above, Dr. Loftin asked Dr. Beck to "rule out fistulotomy" and advised him that Gilbert had already been approved for a colonoscopy prior to Gilbert's appointment with him (Doc. 131-5, p. 1; Doc. 131-9, p. 1). In addition, she informed Dr. Beck that she and her staff would perform Gilbert's history, physical, and blood work. *Id.*  Dr. Beck maintains that he was not under the control of the State of Illinois or the IDOC when he examined Gilbert because he performed Gilbert's colonoscopy and determined that a fistulotomy was unnecessary based on his own independent medical judgment (Doc. 102, pp. 2; 9, ¶9).

Gilbert, however, argues that a reasonable trier of fact could find that Dr. Beck's actions were controlled by the IDOC through Dr. Loftin because Dr. Beck did exactly what Dr. Loftin asked him to do when she asked him to examine Gilbert (Doc. 131, p. 6).  Gilbert argues that Dr. Loftin's statement "rule out fistulotomy" was a directive for Dr. Beck to ***conclude*** that Gilbert did not need surgery. *Id.*

A fair reading of the evidence shows that when Dr. Loftin asked Dr. Beck to "rule out fistulotomy," she was asking him to determine whether Gilbert needed surgery rather than dictating Dr. Beck's conclusion.  However, Dr. Beck does acknowledge that if he wanted to do something other than a colonoscopy for Gilbert he would have had to obtain approval from Dr. Loftin (Doc. 133-1, p. 6).  He testified: "[e]verything we do they have to approve it somehow....

8

Dr. Loftin usually gets approval from somewhere. I don't know exactly from where, but she has to get approval for the treatment." (Doc. 133-1, p. 6). In non-emergencies, Dr. Beck had to get approval before performing any procedure that was not pre-approved. *Id.*

Dr. Beck's assertion that private physicians are removed from the purview of §1983 when exercising independent professional judgment fails. "The exercise of... independent professional judgment" is not the test. ***West*, 487 U.S. at 52, n. 10;** *see also* ***Baxter v. Fulton-DeKalb Hosp. Authority,* 764 F.Supp. 1510, 1517 (N.D. Ga. 1991 ("A physician exercising purely medical judgment may also be liable as a state actor under §1983.") (citation omitted).** This Court's task is to determine if, based on the record, there is a genuine issue of material fact as to whether Dr. Beck's treatment decisions were so influenced by Gilbert's "status as a prisoner" and the "directive of the state," that a reasonable juror could find that Dr. Beck acted under color of state law. ***Rodriguez,* 577 F.3d at 827.**

Keeping the public function test in mind, a reasonable juror could conclude that the state exercised control over Dr. Beck's treatment decisions, and in doing so, delegated its function to Dr. Beck to treat Gilbert's condition. Dr. Loftin authorized Dr. Beck to perform a colonoscopy to determine if surgery was necessary. As Dr. Beck conceded, everything he did had to be approved through Dr. Loftin. Dr. Loftin and her staff retained the right to perform Gilbert's physical examination and blood work and to take his history, all of which information Dr. Beck needed to conduct his examination.[5] While the Court disagrees with Gilbert's argument that Dr. Loftin told Dr. Beck to *conclude* that he did not need surgery, essentially, Dr. Beck did no more than what Dr. Loftin asked him to do.

---

[5] Two days before Gilbert's appointment, Dr. Beck faxed Dr. Loftin an "urgent" request stating he was still waiting for her to provide him with Gilbert's history, physical and lab work (Doc. 131-6, p. 1).

9

A juror could find that Dr. Beck made his treatment decisions either because no other treatment was necessary or because he treated Gilbert solely as he was authorized to do. As a result, under the Court's analysis of the second factor of the test, a genuine issue of material fact remains as to whether the degree of state control over Dr. Beck's actions was such a significant factor that his actions could be fairly attributed to the state.

### *The contractual relationship between the state and the medical care provider*

In considering this factor in *West*, the Supreme Court reasoned that, where a private physician entered into a contract with the state to provide medical treatment to inmates, state action was present because that physician "voluntarily assumed" the state's obligation to care for its inmates by contract. **West, 487 U.S. at 55-56.** Yet, the Court was careful to warn against giving too much weight to the "precise terms" of a physician's employment. The determining factor is "the physician's function within the state system, not the precise terms of his employment.... Whether a physician is on the state payroll or is paid by contract..." is not dispositive. **Id.; Rodriguez, 577 F.3d at 825.**

Consequently, the Seventh Circuit concluded that "[a]lthough *West* tells us that the contractual relationship between the state and the medical care provider cannot be the *focus* of our inquiry,... it nevertheless must be an important factor in determining whether the private health care provider has entered into its relationship with the state and the prisoner on a *voluntary* basis." **Rodriguez, 577 F.3d at 827 (emphasis in original) (internal citation omitted)**. The appellate court found "no basis in the Supreme Court's case law for concluding that a private entity can be burdened with the responsibilities of the state for the care of its prisoners unless the entity assumes that responsibility voluntarily, and one of the principal ways, indeed the principal way, by which a private entity would undertake such a responsibility is by entering into a contractual relationship." *Id*. The Court reasoned, "Similarly, when a person

10

accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution." *Id.*

Dr. Beck, in his affidavit, submits that he does not have a contract with the State of Illinois or the Illinois Department of Corrections to treat inmates (Doc. 102-1). Moreover, Dr. Beck and the hospital maintain that he was not employed by the hospital because he was an independent contractor. *See* Doc. 133-2, Florkowski Dep. 39:13-40:21.

There is however, a genuine issue of material fact as to whether the hospital had obligated itself by contract to provide for the medical care of inmates in November 2006. As Florkowski testified, the hospital entered into a contract to provide treatment to inmates because "[i]t made good logical sense. The prison's located in our county. The inmates are going to need medical and we're the closest hospital for them to get care at." (Doc. 131-2, Florkowski Dep. 11:5-11). Although Florkowski agreed that the contract was between the Illinois Department of Corrections and the hospital, the actual signatories to the agreement submitted to the Court were the hospital (by the President and CEO) and HPL (by the CEO/CFO). *See* Doc. 131-2, Florkowski Dep. 8:18-22; Doc. 131-8. The contract describes HPL as "the health care provider" for inmates housed at Lawrence, and it obligated HPL to pay the hospital "for services rendered to inmates at the hospital" (Doc. 131-8, pp. 3, 16). The hospital in turn agreed to provide "medical and hospitalization services for inmates or detainees from IDOC-Lawrence Correctional Center facilities." (Doc. 131-8, pp. 3, 5,16). The term of the contract was from June 1, 2004 through June 1, 2005, with a provision that the contract "shall automatically renew for one year periods hereafter." (Doc. 131-8, p. 14).

However, Dr. Beck submitted evidence that, at the time relevant to these proceedings, November 2006, HPL was no longer the healthcare provider for inmates housed at Lawrence; rather, Wexford Health Sources, Inc. - which did not have a contract with the hospital

11

- was the healthcare provider for Lawrence inmates (Docs. 133, 133-3).[6]  According to the affidavit of Joe Ebbitt, Wexford's risk manager, in November 2006, Wexford had a contract with the IDOC to provide medical services to inmates at Lawrence but at no time had a contract with the hospital or Dr. Beck.  (Doc. 133-3, Ebbitt Aff.)

This creates a genuine issue of a material fact as to whether, at the time Dr. Beck treated Gilbert, the hospital was contractually obligated to care for inmates.  If the HPL contract was "automatically renewed" and in effect in November 2006 - an open question given Florkowski's testimony - a trier of fact could conclude that Dr. Beck's position as a staff physician obligated him to act in accordance with the Constitution.  As ***Rodriguez*** teaches, accepting employment with a private entity that contracts with the state carries with it the responsibility of performing one's duties in conformity with the Constitution.[7]  Moreover, the HPL contract aside, a jury could also reach the same conclusion based on Florkowski's testimony that the hospital was contractually obligated to treat inmates (Doc. 131-2).

---

[6] Dr. Beck's reply (Doc. 133) to Gilbert's response to his motion violated Local Rule 7.1, which limits replies to five pages.  The Court therefore considered only the first five pages (and the exhibits referenced in those pages) in issuing this order**.  *See Shelter General Ins. Co. v. Zurich Direct, f/k/a  Universal Underwriters Group, et al., 2008 WL 4449873, \*1, n.1. (S.D. Il. 2008).**

[7] The fact that Beck may be an "independent contractor" at a hospital which contracted to provide medical care to inmates will not necessarily prevent a finding that state action was present.  "[S]ometimes the action of an independent contractor is considered state action.  The essential question is whether the nominally private conduct is attributable to the state." *Lewellen v. Schnek Med. Center,* **2007 WL 2363384, \*6 (S.D. Ind. 2007) (***citing Academy f. Tenn. Secondary Sch. Athletic Ass'n,* **531 U.S. 288, 295 (2001);** *Lugar v. Edmonson Oil Co.* **457 U.S. 922, 935, n. 18 (1982).** Moreover, although the issue of Beck's employment relationship is not squarely before the Court and need not be decided today, there are many aspects of Dr. Beck's relationship with the hospital that raise doubt about his status as an independent contractor. ***See Miller v. Advanced Studies, Inc.* 635 F. Supp. 1196,  1200 (N.D. Ill. 1986) (noting that a person's job title in a written contract is not dispositive of issue as to whether he is an independent contractor).**

Finally, it is important to note ***Rodriguez*** suggested that the purpose of analyzing the contractual relationship was to determine whether the physician "voluntarily assumed" the function of the state as the entity having the responsibility for the inmate's care. ***Rodriguez,* 577 F.3d at 827.** The court went on to say, however, that while a contract was a principal way to show that it voluntarily assumed responsibility for the care of the inmate, it is not the only way. ***Id.* at 827, n. 17.**

The record shows that Dr. Beck testified that "he did not have a contract with the State of Illinois, the Illinois Department of Corrections, or any individual prison to see inmates as patients or to perform consultations. *I was not obligated by virtue of any employment or contractual relationship to accept Mr. Gilbert as a patient*" (Doc. 131-7) (emphasis added). A juror could therefore conclude that Dr. Beck voluntarily assumed the function of the state as the entity having the responsibility for Gilbert's care. ***See Conner,* 42 F.3d at 226 (holding that even in the absence of a contractual relationship between the medical care provider and the state, "a private physician who treats a prisoner upon referral by the state, and who knows that the patient is a prisoner, voluntarily assumes the state's obligation to provide medical care to inmates.")**. Under the Court's analysis of the third factor of the test, summary judgment is not warranted.

### *The relationship between the medical care provider and the inmate*

The fourth and final factor this Court must assess is the relationship between Gilbert and Dr. Beck. This factor tips heavily in Dr. Beck's favor because his examination of Gilbert in November 2006 was the only time that he saw Gilbert. Standing alone, a reasonable juror could conclude that Dr. Beck merely assisted Dr. Loftin and did not assume the state's function and responsibility to care for Gilbert. ***Rodriguez,* 577 F.3d at 828 ("To the degree that a private entity does not replace, but merely assists the state in the provision of health**

**care to prisoners, the private entity's responsibility for the level of patient care becomes more attenuated, and it becomes more difficult to characterize its actions as the assumption of a function traditionally within the exclusive province of the state.")** Nevertheless, it is the function the physician assumes - not the amount of time a physician spends in treating the inmate that is dispositive. *West,* **487 U.S. 56.** A juror could conclude that when Dr. Beck assumed a function of such gravity (*i.e.* determining whether Gilbert needed to have surgery), his action replaced that of the state in providing healthcare to Gilbert. Under the Court's analysis of the fourth factor of the test, summary judgment is not warranted. As a result, a genuine issue of material fact remains, and summary judgment is not warranted.

### III. Conclusion

For all of the above-stated reasons, the Court **DENIES** Dr. Beck's motion for summary judgment (Doc. 102).

**IT IS SO ORDERED.**

**DATED this 11th day of February, 2010**

                                              **s/Michael J. Reagan**
                                              **MICHAEL J. REAGAN**
                                              **United States District Judge**